Tallulah MORGAN et al.,
Plaintiffs-Appellees,

v.

John J. KERRIGAN et al.,
Defendants-Appellants.

No. 74–1251.

United States Court of Appeals,
First Circuit.

Dec. 19, 1974.

Certiorari Denied May 12, 1975.

See 95 S.Ct. 1950.

John O. Mirick, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for appellants.

J. Harold Flannery, Washington, D. C., with whom Laurence S. Fordham, John Leubsdorf, Foley, Hoag & Eliot, Boston,

Mass., Robert Pressman, Eric E. Van Loon, Cambridge, Mass., Roger I. Abrams, Cleveland, Ohio, Thomas M. Simmons, Collins & Simmons, Boston, Mass., and Nathaniel R. Jones, New York City, were on brief, for appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Two decades after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the refractory issue of school desegregation for Boston reaches this court. It reaches us after scores of cases have been litigated and decided in the South, where state laws and constitutions had effectuated a dual school system along racial lines. Perhaps more relevantly, it reaches us after a number of decisions affecting northern cities where segregation had often resulted from local practices rather than laws.[1] Most significantly, this case comes to us (and the district court) only after passage of a state Racial Imbalance Act in 1965, Mass.G.L. c. 71, §§ 37C, 37D,[2] and almost a decade of litigation before the courts of Massachusetts and state and federal administrative bodies.[3]

Despite rulings in most of these cases requiring affirmative action to comply with state law or with the federal constitution, little took place in Boston other than continued litigation. This action was filed in March, 1972, by black children attending the Boston public schools and their parents (later certified as proper representatives of the class of all such parents and children) against the Boston School Committee, its individual members, and the Superintendent of the Boston Public Schools (the "city defendants" and appellants) and the Board of Education of the Commonwealth of Massachusetts, its individual members, and the Commissioner of Education (the "state defendants").[4] Plaintiffs sought declara-

1. See, e. g., Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Detroit); Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) (Denver); Brinkman v. Gilligan, 503 F.2d 684 (6th Cir. 1974) (Dayton); Oliver v. Michigan State Bd. of Educ., 508 F.2d 178 (6th Cir. 1974) (Kalamazoo); Berry v. School Dist., 505 F.2d 238 (6th Cir. 1974) (Benton Harbor, Mich.); United States v. Board of School Comm'rs, 474 F.2d 81 (7th Cir.), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973) (Indianapolis); Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973) (Las Vegas); Davis v. School Dist., 443 F.2d 573 (6th Cir. 1971) (Pontiac); United States v. School Dist. 151, 432 F.2d 1147 (7th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971) (Cook County, Ill.); Clemons v. Board of Educ., 228 F.2d 853 (6th Cir.), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956) (Hillsboro, Ohio); Taylor v. Board of Educ., 294 F.2d 36 (2d Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961) (New Rochelle); Booker v. Special School Dist. No. 1, 351 F.Supp. 799 (D.Minn.1972) (Minneapolis); Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501 (C.D.Calif.1970).

2. The origins of the statute are discussed, and the essence of its provisions set out, in the district court's opinion. 379 F.Supp. at 417–418. The Act was amended, after the district court opinion was filed, to limit sharply the measures which the state board may employ in attempting to bring about racial balance in the schools. St.1974, c. 636 (July 26, 1974). The Massachusetts Supreme Judicial Court recently considered these amendments, and found that they would be unconstitutional if interpreted to reverse or impede the progress toward the achievement of racial balance in a city already subject to a state court order that a racial balance plan be implemented. School Comm. v. Board of Educ., Mass., 319 N.E.2d 427 (1974) (Springfield). Since the district court's opinion is founded upon the federal constitution, the merits of this appeal would in no event be affected by the amendments.

3. The district court's opinon, 379 F.Supp. 410, 418–421 (D.Mass.1974), contains a succinct summary of this history of litigation, involving seven decisions of the Massachusetts Supreme Judicial Court, three decisions of a Single Justice thereof, a number of Superior Court proceedings, a decision of a federal Administrative Law Judge resulting in the withholding of many millions of dollars in federal educational assistance funds and, at 379 F.Supp. at 450–451, a discussion of the decision of the Massachusetts Commission Against Discrimination, finding discrimination in the Boston School Committee's open enrollment and controlled transfer practices.

4. The state defendants, whose position on most issues was identical with that of plaintiffs, were found not to have intentionally contributed to racial segregation in the Boston public schools. On the contrary, the court held that they had done all that was

tory and injunctive relief, alleging that various actions of the city defendants, hereinafter discussed, denied black children both the equal protection of the laws and equality of educational opportunity, in violation of the Thirteenth and the Fourteenth Amendments and federal civil rights statutes.

## I. THE DECISION OF THE DISTRICT COURT

The district court made an exhaustive inquiry into the operations of the Boston School system. The parties cooperated in arriving at stipulations of undisputed facts and in facilitating the admission into evidence of depositions and testimony from prior proceedings. The introduction of live testimony and depositions from some thirty witnesses took fifteen trial days, and over 1,000 exhibits were produced. The court then painstakingly set forth the complex factual background, the reasoning leading to its findings, and its conclusions of law in a lengthy opinion issued June 21, 1974. Morgan v. Hennigan, 379 F.Supp. 410 (D.Mass.).

The court dealt not only with the fact of segregation in the Boston Schools, but with whether segregation was due to deliberate and purposeful discrimination by Boston school authorities. The "segregative intent" of school officials has been a legal issue of importance in school desegregation cases. See Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). This is so because under the Constitution, no state may deny to its citizens the equal protection of the laws, and a school system segregated by the deliberate design of local

authorities reflects the action of the state or municipality as surely as if segregation had been required by statute. Having found such deliberate design, the court left the question of remedy to a future time. This appeal is therefore limited to the court's findings and conclusions relating to purposeful segregation.

In its opinion the court, after reviewing the background of litigation we have noted, n. 3 *supra*, described the structure and powers of the Boston School Committee and the complex organization of schools under its command—a mixture of schools serving districts and schools serving the entire city, some on the basis of examinations and some not; a combination of three methods of grade progression (8–4; 5–4–4; 6–3–3); and, in addition to elementary, "middle" (grades 6, 7 and 8), junior high (grades 7, 8 and 9), and high schools, special schools such as "magnet" schools, a model demonstration system, and vocational schools. The court next found that while the 1971–1972 public school enrollment comprised 59,300 whites (61%) and 30,600 blacks (32%),[5] this ratio was approached in few of the schools, whatever their geographic area, grade level, or type.[6] This fact of racial imbalance in the public schools led the court to inquire "whether the defendants have intentionally and purposefully caused or maintained racial segregation in meaningful or significant segments of the Boston public school system, in violation of the Fourteenth Amendment." 379 F.Supp. at 425. The court looked at defendants' actions in six areas: (1) facilities utilization and new structures, (2) districting and redistrict-

possible under their limited authority to compel the city defendants to obey the state law and the federal constitution. The court, however, retained the state defendants in the case to help in the formulation and implementation of remedies. The state defendants have not appealed. Where unqualified reference is made to "defendants" in this opinion, only the city defendants are embraced by the term.

5. Non-black minority students comprise approximately 7% of the city's public school population, but no issues with regard to possible discrimination against these students

were presented to or considered by the district court. See 379 F.Supp. at 415 n. 1.

6. Of eighteen high schools, only two came close to that ratio. All of the five citywide special examination and trade schools were either overwhelmingly black or overwhelmingly white. The four middle schools were from 63% to 94% black. Only two of the fifteen junior high schools approached the overall student ratio, the others being predominantly white or black. Only five of some 140 elementary schools came within 10% of the overall 61:32 ratio.

ing, (3) feeder patterns, (4) open enroll-. ment and controlled transfers, (5) faculty and staff, and (6) vocational and examination schools.

It found: as to (1), "affirmative acts . . . related to overcrowding which . . . intentionally created or maintained racial segregation" (379 F.Supp. at 427); as to (2), that, while defendants made no changes to bring about segregation where there was none before, they made at least one change to perpetuate racial segregation; consistently rejected proposals to redistrict for racial balance, being aware of the racial impact of their actions, while engaging in redistricting when no racial implications were involved; and finally, to meet pressure from the state Board of Education and the courts, proposed a review of all district lines and a comprehensive plan for achieving racial balance, only to sabotage both proposals; as to (3) that defendants inaugurated changes in feeder patterns for the 1967–1968 and 1968–1969 school years, with knowledge of the probable consequences and "for the purpose of promoting racial segregation" (379 F.Supp. at 449), which routed black students into high schools beginning with a ninth grade while white students, equipped with transfer options, were channeled into high schools beginning with tenth grade; as to (4), that "open enrollment and controlled transfer policies were managed under the direction of the defendants with the singular intention to discriminate on the basis of race" (379 F.Supp. at 455).

The court, addressing the issues relating to faculty and staff, found that 74 percent of the system's 356 black teachers and all black principals and assistant principals were in predominantly black. schools. After scrutinizing the record and policies as to transfers, the exclusive dependence on a written examination for hiring, and the obstacles to promotion of administrators, the court held that plaintiffs had established their equal protection and equal educational opportunity claims and also their claim that defendants violated their right to have the school system operated free of racial discrimination in the selection and promotion of teachers and staff. Finally, seeing the high degree of segregation in the city's elite examination high schools and trade schools, the former white, the latter black, the court relied on the presumption of intent recognized in Keyes v. School Dist. No. 1, 413 U.S. 189, 207–211, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), which it found unrebutted. Other findings and conclusions will be discussed where relevant.

## II. THE BASIC CHALLENGE: THE STANDARD OF JUDGMENT

Defendants do not challenge the findings below as to the extent of racial segregation in Boston's schools. Nor do they, in the main, challenge findings as to what they have done or not done. Their position is that the present segregation is not a product of their intent, but is "due to factors over which the city defendants have had and have no control, or is due to the policy of providing neighborhood schools, a policy which long predated any segregation now complained of, which city defendants claimed was constitutionally permissible."[7] Defendants view the proof as establishing only that "the city defendants were faced with a school system in which considerable de facto segregation existed, and continued to operate that school system without taking affirmative action to counteract that de facto segre-

7. Before the district court the city defendants also raised the similar defense, alluded to in this quotation from their brief, that they were entitled to adhere to a neighborhood school policy, which would be constitutionally valid despite any segregative consequences. The district court pointed out that several practices of the defendants were antithetical to such an asserted policy: extensive busing, open enrollment (and, we add, controlled transfer), multi-school districts, magnet schools, citywide schools, and feeder patterns, 379 F.Supp. at 473. Moreover, the court noted, the elementary district map is inconsistent with the neighborhood concept, schools being located near the edges of districts rather than near the center. Defendants have not stressed this defense on appeal.

gation." Throughout their brief and argument, they characterize their conduct as "mere inaction" or "mere failure to take affirmative action".

We note, but leave for later discussion, the fact that the district court made a number of findings based on the initiation of new actions and policies which could hardly be termed "mere inaction", e. g., feeder patterns, open enrollment and controlled transfer policies. Thus the district court's findings of intentional discrimination have support quite apart from the evidence of inaction. To some extent, however, the district court, as in its treatment of defendants' approach to redistricting, did place emphasis on the Committee's rejection of all proposals to redistrict when the failure to do so would predictably increase or perpetuate segregation.

■ We therefore deal with defendants' basic contention that school authorities in a northern city which has never had a statutory dual school system cannot be found to have violated the constitution unless they have taken affirmative acts which have brought about segregation in the schools. We have carefully considered this argument, since it is the one put forth most vigorously in this appeal, and have found it to be without support. The controlling test is that propounded in Keyes, where the relevant inquiry is described as an effort to determine whether the authorities' "policies and practices . . . were . . . taken in effectuation of a policy to create or maintain segregation." 413 U.S. at 213–214, 93 S.Ct. at 2700. See also 413 U.S. at 198, 93 S.Ct. at 2692 ("brought about or maintained by inten-

tional state action"); at 211, 93 S.Ct. at 2699 ("create or contribute to the current segregated condition"); at 214, 93 S.Ct. at 2700 ("policy to create or maintain segregation").[8] That is, Keyes does not merely speak to those activities which cause or bring about segregation, but proscribes as well efforts to maintain segregation which may in the first instance be attributable to outside forces. And neither Keyes, which speaks in terms of "policies and practices", nor the cases which went before it support the suggestion that official policies and decisions which do not call for affirmative actions may not be considered by a court when it determines whether segregation has been intentionally promoted or maintained. "Every act of a school board and school administration, and indeed every failure to act where affirmative action is indicated, must now be subject to scrutiny." Keyes, 413 U.S. at 234, 93 S.Ct. at 2710 (Powell, J., concurring in part and dissenting in part); id. at 230, 93 S.Ct. at 2708 (the Court "searches for de jure action in what the Denver School Board has done or failed to do") (Powell, J.).

■ Not only is it inconceivable that the repeated rejection of proposals which would promote desegregation could not properly be considered by a court as evidence of an intent to create or maintain segregation, but there can be no doubt that defendants' failures to act are probative evidence of intent when it is remembered that they labored under the specific legal obligations imposed by the Massachusetts Racial Imbalance Act. "Plainly, where public issues are framed and questions posed which bear directly

---

8. These passages from Keyes obviously find their antecedent in Swann v. Charlotte-Mecklenburg Board of Educ., 402 U.S. 1, 91 S.Ct. 267, 28 L.Ed.2d 554 (1971). At 202 of 413 U.S. at 2694 of 93 S.Ct., Keyes quotes from Swann, 402 U.S. at 20–21, 91 S.Ct. 1267, which refers to choices of the school authorities as to school location and various techniques of student assignment, and states that they have been "used as a potent weapon for creating or maintaining a state-segregated school system."; that sometimes new schools were built in white areas "farthest from Negro population centers in order to maintain the separation of the races" (Keyes, 413 U.S. at 203, 93 S.Ct. at 2695 quoting 402 U.S. at 20–21, 91 S.Ct. 1267); and that merely neutral assignment plans "may fail to counteract the continuing effects of . . . location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation." (Keyes, 413 U.S. at 212, 93 S.Ct. at 2699, quoting 402 U.S. at 28, 91 S.Ct. 1267).

on the quality of education, a deliberate negative response from school authorities or a deliberate omission to act, can affect the shape of subsequent circumstances just as materially as can affirmative decisions and action. State responsibility under the United States Constitution must logically be and is fixed in either context." Oliver v. Kalamazoo Bd. of Educ., 368 F.Supp. 143, 178 (W.D. Mich.1973), aff'd sub nom. Oliver v. Michigan State Bd. of Educ., 508 F.2d 178 (6th Cir. 1974); Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972) (school district had continued a neighborhood school policy at the elementary level); Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501 (C.D.Cal.1970).

If the school administrators of a community were allowed so to deal with a changing school population that the old segregative profile would not only persist but be sharpened, there would be little hope for desegregation anywhere. In short, when administrators face the problems of managing a dynamic system, they seldom have the luxury of "mere inaction". Every decision to act for racial balance or to fight it has consequences.[9] Thus we think the district

court, in determining segregative intent, could properly take account of School Committee decisions not to act as well as its decisions to act affirmatively.

### III. POLICIES AND PRACTICES AFFECTING PLACEMENT OF STUDENTS

We turn now to the district court's findings and conclusions bearing on distribution of students within the school system. We leave the separate issue of faculty and staff until last. We deal first with matters as to which affirmative actions were most prominent—measures dealing with growth of student population, structuring the flow of students, and permissive student options. We then consider redistricting (and the refusal to redistrict) and the issue of examination and vocational schools where liability was predicated on a presumption of intent.

#### A. *Dealing with Growth of the Student Population*

One of the present facts of life in the Boston school system is that where there is overcrowding, it generally occurs in white-majority schools while underutilization, where it exists, is found only in black-majority schools.[10] Defendants, in

---

**9.** The unreality of the action-inaction dichotomy has been underscored by Mr. Justice Powell's opinion, concurring in part and dissenting in part, in *Keyes, supra*, 413 U.S. at 234–235, 93 S.Ct. at 2710:

"The most routine decisions with respect to the operation of schools, made almost daily, can affect in varying degrees the extent to which schools are initially segregated, remain in that condition, are desegregated, or—for the long term future—are likely to be one or the other. These decisions include action or nonaction with respect to school building construction and location; the timing of building new schools and their size; the closing and consolidation of schools; the drawing or gerrymandering of student attendance zones; the extent to which a neighborhood policy is enforced; the recruitment, promotion and assignment of faculty and supervisory personnel; policies with respect to transfers from one school to another; whether, and to what extent, special schools will be provided, where they will be located, and who will qualify to attend them; the determination of curriculum, including whether there will

be 'tracks' that lead primarily to college or to vocational training, and the routing of students into these tracks; and even decisions as to social, recreational, and athletic policies."

**10.** Charlestown, Hyde Park, Roslindale, and South Boston High Schools as well as Cleveland, Graven and Rogers Junior High Schools, each with between 84 and 99% white students, are overcrowded. In addition, Dorchester High, the exception to the rule, with 52% black students and 46.8% white students is also overcrowded.

Boys Trade, English High, Girls High, Jeremiah Burke High, King Middle School and Timilty Junior High School, each with 66 to 95 percent black students, have a substantial number of vacant seats. The pattern was also observable at grade school levels. 379 F.Supp. at 426. The district court points out that some cases were extreme and dramatic. South Boston High, all-white, was overenrolled by 676 students in the 1971–1972 school year; at the same time 92% black, Girls High was underutilized by 532 places.

meeting the problem of overcrowded schools, have utilized three principal techniques. These are reassignment to other schools, use of portable classrooms located adjacent to the main school building, and the building of new school buildings or additions.[11]

The district court found students in 91 percent white Cleveland Junior High School were reassigned to 99 percent white South Boston High which ultimately suffered from overcrowding, although the racial balance of other closer schools, with vacant seats, would have been improved by receiving such students. The court also found that students from overcrowded schools were sometimes transferred to alleviate overcrowding, but only where racial balance was not affected.[12] The explicit reason given by top school officials for not assigning whites to black-majority schools was that this would "create a problem" on the part of white parents. This, we observe, is an endemic problem, but public clamor has long been deemed beyond the pale as justification for racial segregation. E. g., Cooper v. Aaron, 358 U.S. 1, 15–16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958).

The same policy was apparent in the use of portable classrooms.[13] Of 46 such classrooms in use in 1972–1973, 37 were used at schools with white majority of 70 percent or more, five at schools with a white majority of 50 to 70 percent, and only four at black-majority schools. The School Committee turned a deaf ear to proposals of both the Kiernan Report in 1965 and a state task force report in 1966 that portables be used to reduce segregation, on the ground that portables were "educationally undesirable"; but during each of those years it used portables to perpetuate the racial mix that existed.

In its jousts with the state Board of Education, the School Committee held out hopes of new facilities as an adequate means of advancing racial balance. Its performance was not spectacular. Of twenty new openings between 1967 and 1972, nine buildings opened with a 60 percent or more black majority; seven opened with an 87 percent or more white majority; four opened with an enrollment ranging from 40 percent black to 40 percent white. The district court analyzed in some detail the circumstances surrounding the opening of four schools: Weld, which opened largely black, despite the fact that it was in a white neighborhood and there was the possibility of taking more whites and moving black children to white schools; Hennigan, also largely black on opening through ineffectual efforts to recruit white volunteers, the efforts known to be ineffectual far in advance of opening; Lee, its opening on a balanced basis foreseeably doomed by publicized options to whites to attend overcrowded Fifield and O'Hearn, the option belatedly and secretively revoked shortly before opening, the result being chaos when 200 blacks illegally registered on opening day; and new English High, first intended for the enrollment of students of old English (largely black), then switched by the Committee at a later date for the Girls

---

**11.** A fourth is busing. While the school board has balked at mandatory busing for whites, a great deal of voluntary busing has been undertaken in Boston. In addition to the regular busing of one third of Boston's students, primarily to high schools, there were voluntary programs aimed at improving integration. The Metco and Exodus plans involved the busing of black school children to the suburbs of Boston. In addition, the only mandatory busing that took place was busing of black elementary school children for the short time that the Weld School was open. Although the policy had been one of voluntary busing, the parents of black students were given no choice when their children were bused distances of up to two miles.

**12.** Bradford-Walcott students (blacks) were transferred a mile and one-half to the Weld School which opened 87% black even though it was in a white locale. And the district court found that similar transfers, alleviating overcrowding but not improving racial balance, were made from English High to Roosevelt and Edison Schools from 1964 to 1970.

**13.** To some extent the use of portables to relieve overcrowding was necessitated, as noted above, by the failure to utilize available seats in nearby schools.

Latin student body (largely white), then forced by a Massachusetts court decision to revoke its "unilateral" decision.[14]

Appellants object to being held responsible for these contributions to imbalance, saying that they do not control the building process, that the population profile of the areas served by the new schools changed radically between the time of planning and the time of opening, and that much of the result was brought about by student pressure. The district court observed, however, that the Superintendent of Schools had a veto power over site selection, that appellants had the benefit of demographic predictions which proved remarkably accurate, and that the student pressure, where it existed, was a crisis of the Committee's own making.

■ We conclude that this pattern of selective action and refusal to act can be seen as consistent only when considered against the foreseeable racial impact of such decisions. Moreover, this pattern has been accompanied by statements of express intention not to counter anti-integration sentiment. We think the district court was clearly correct in this finding of affirmative action. The actions of the Boston authorities are not distinguishable from what the Supreme Court has termed the "classic pattern of building schools specifically intended for Negro or white students." *Swann, supra,* 402 U.S. at 21, 91 S.Ct. at 1278, 28 L.Ed.2d 554.

## B. *Structuring Flow of Students: Feeder Patterns*

By "feeder patterns" is meant the system of moving students from the elementary schools ending in grade eight, junior high schools, and middle schools to high schools. The methods of accomplishing this transition include seat assignments, preferences and options. After attending lower grades in a district system, students are channeled through a feeder pattern to a particular high school. High schools, then, do not have geographic boundaries as such, but are supplied with students by feeder patterns. 379 F.Supp. at 441. Although not part of the "feeder pattern" as such, a determination of what schools are attended prior to high school has a vital impact on the choice of high school for any individual student. Certain high schools are three year schools (grades 10–12), while others are four year schools (grades 9–12).[15] Prior to high school, i. e., before application of a "feeder pattern", children may attend elementary schools ending in grade eight or a middle school ending in grade eight or a junior high ending in grade nine. By creating black middle schools, the School Committee assured that the most natural way to channel the graduates of those schools would be into four year schools and away from three year high schools. In particular, with the conversion of two black junior high schools (Lewis and Campbell) to middle schools[16]

**14.** Plaintiffs assert that the court could have pointed to other examples. Defendants complain that the court ignored evidence or failed to make sufficiently specific findings rejecting evidence. We juxtapose these observations merely to note that the court must make sufficient findings; it does not have to make findings on every proposition put to it by the parties. *See* 9 Wright & Miller, Federal Practice and Procedure, § 2579 (1971); Moore's Federal Practice ¶ 52.01 [5]. Moreover, the question on appeal is whether the record as a whole supports the district court's findings of fact. Rule 52 Fed.R.Civ.Pro.

**15.** Boston has 18 high schools. Nine are theoretically fed by all intermediate schools, junior highs and middle schools throughout the system. Six are examination schools (discussed *infra*); one is a special program school; the remaining two are general schools, English High and Girls High. The nine remaining schools, Brighton, Burke, Charlestown, Dorchester, East Boston, Hyde Park, Jamaica Plain, Roslindale and South Boston are fed only by designated intermediate schools. Citywide, only English and Girls High include 9th grade. Of the district high schools only East Boston, South Boston and Burke for girls include 9th grade. The six district schools containing grades 10, 11, and 12 can be fed only by junior highs.

**16.** In 1967 Lewis and Campbell had among the highest percentages of black students of junior highs in Boston. 379 F.Supp. at 444 n. 23. The change to middle schools began in

and the channeling of their students into English, Girls High and Burke, it was not surprising that the latter became increasingly black. In addition, beginning in 1967, new feeder patterns were established and further refined in 1968. They amounted, according to the district court, to a "redistricting" of several high schools.

The details are incredibly complex. For a thorough analysis, see 379 F.Supp. at 442–446. But the results, when the dust settled, were clear: (1) graduates of heavily white kindergarten through eighth grade schools (Cheverus, Russell and Parkman) were given seat preferences at white high schools; and while white graduates of schools ending in grade eight (Prince, Thompson, McCormack and Russell) were given seat preferences at high schools where black students were given seat preferences as well—English, Burke and Girls High, they were also given options of attending white high schools; (2) graduates of heavily black schools ending in grades eight (Martin, Dearborn and Campbell) and heavily black and other minority schools (Lincoln-Quincy, Rice-Franklin) were given seat preferences only at English, Girls and Burke; (3) students at identifiably white Michelangelo Junior High, which had fed only English for several years, were given an option of attending identifiably white Charlestown when the segregatory options started to take effect at English; (4) white students almost invariably used the options available to them to escape black schools. While this is only a brief summary of major actions taken, the consequence, particularly upon English High, was, as could have been predicted from even cursory analysis of the pattern, a rapid change in racial composition.

Appellants object to the drawing of inferences from these results. They assert that the initial motivation of feeder patterns was to aid integration, that feeder patterns encouraged blacks to attend white-majority schools, and in any event were a long standing procedure, antedating 1967. But the court found that the Committee by 1970, and certainly by 1971, was fully aware of the imbalancing consequences of feeder patterns, that the availability of options to whites and the relative unavailability of options to blacks predictably frustrated any integration, and that, before 1967, there was no evidence of well recognized patterns generally followed. In addition, the court found, and the record supports its findings, that the only consistent basis for feeder pattern designations, changes and deletions was the racial factor, and that no school committee justifications pertaining to the educational or safety needs of the school children withstood scrutiny. For example, the supposed educational justification for opening middle schools was undermined by the fact that after the four heavily black middle schools opened Boston dropped the plan for other students.

■ Here again, we see not inaction but new initiatives, explained only by a racial objective. The district court's language was strong and clearly correct, given the facts: "The consequence of the feeder pattern changes and discriminatory options, in combination with the opening of four middle schools, was altogether foreseeable, almost immediate, and well-understood, by the defendants: a dual system of secondary education was created, one for each race. Black students generally entered high school upon completion of the eighth grade, and white students upon completion of the ninth." 379 F.Supp. at 447–448.

C. *Permissive Student Options*

Superimposed on this Byzantine system was the option for individual students to enroll in schools to which they would not normally be assigned. The concept originated in 1961, the hope then being that integration would be advanced. In the years following, however, it became clear that the Committee would resist every suggestion that these

1968–1969. McCormack, previously grades 4–8, located near Columbia point, was designated a middle school as was Thompson, previously grades 1–8.

options be restricted to those which would contribute to racial balance and would encourage the use of these options to foster segregation in Boston schools. Defendants attempt to make here a variation of the argument they have clung to throughout this case. They say that they instituted open enrollment for integrative purposes—and that is where the court's exploration should end. The good motive at the outset sanitizes, they argue, all the consequences of their activity, any subsequently developed motivation or acquired knowledge, and all subsequent actions consciously promoting segregation. The rest was mere inaction. We, like the district court, find little to recommend that argument on the facts presented.

We start with a short history of the open enrollment policy. Soon after it was adopted in 1961 it became apparent that whatever the original motivation had been, white students were using the transfers to escape from schools where there were high concentrations of minority students. From 1966 to 1971 there was an intense but unsuccessful effort on the part of the state, acting under the Massachusetts Racial Imbalance Act, to compel a limitation on transfers. The defendants were intransigent. In 1971, in order to achieve the release of state funds withheld because of violation of the law, defendants finally agreed to prohibit transfers which would increase imbalance as defined by the act. The court below paid special attention to this chapter of the School Committee's history, finding it illuminative of the reasons for the actions taken.

In 1966, for a ten day period, the School Committee amended the open enrollment policy to prohibit transfers aggravating racial imbalance. This action was taken in light of the withholding of state funds and rejection of the defendants' 1965 racial imbalance plan. When the state Board did not revoke its disapproval of the plans, in the wake of the limitation on transfers, the Committee met and acted. It rescinded the limitation. No change in the underlying segregative policy of open enrollment was made during the remainder of this period. The purpose was clear and can be readily grasped from the words of the chairman of the Committee as late as 1970 when the issues of limiting transfers was again raised:

"Of course the thing that would have everyone deeply concerned would be again a school like the Lewenberg which starts to become evenly balanced or has become so and the white youngsters start to apply under open enrollment to move out, and under this they would be pretty much chained to their seats. They wouldn't be allowed to move."

Further support for segregative intent is gleaned from a staff memorandum dated July 9, 1971 which described open enrollment as "parental choice as to school attendance, historically granted to families in changing neighborhoods." The words of the Committee members and papers confirm the district court's judgment that open enrollment had become "a device for separating the races and contributed significantly to the establishment of a dual school system." 379 F.Supp. at 453.

The "controlled transfer policy", adopted in 1971, supposedly ended open enrollment. The district court, however, found the new policy honeycombed with exceptions—a grandfather clause, a grandfather-plus clause covering those who had merely applied for transfers, a grandfather-plus-plus clause covering younger brothers and sisters of a transferee, transfers within a multi-school district, and an open-ended hardship clause, which amounted to an "escape clause" or "big out", available for racial reasons.

The district court drew the conclusion that "open enrollment and controlled transfer policies were managed . . . with the singular intention to discriminate on the basis of race." 379 F.Supp. at 455. We see no basis for challenging this finding.

### D. Redistricting

Districting, the drawing of geographical boundaries for attendance purposes,

does not apply to the high schools in Boston. As we have indicated, their student bodies were determined by feeder patterns. Alterations of feeder patterns accomplished the same goals as redistricting or the changing of attendance zones of existing schools. We treat here only actual changes in geographical attendance zones and necessarily confine ourselves to the effect on lower schools.

As indicated above, we now enter an area where decisions were mostly not to do something. There are, even here, some affirmative actions either pro-segregation or in perpetuation of segregation. For example there were districting changes affecting certain fifth and sixth grade classes that were "tracks" to the three examination schools. White students ultimately comprised more than 80 percent of these classes. 379 F.Supp. at 433 n. 16. And redistricting was undertaken where greater integration would not come about, thereby perpetuating existing disparities. In 1959 the boundary lines of the districts for Cleveland and Campbell junior highs were altered for administrative reasons; between 1963–1964 and 1969–1970 Roosevelt junior high in Roxbury and Edison junior high in Brighton were redistricted to house an overflow of students from English high; and in 1969–1970 the Boardman district was changed to accommodate the fourth grade at overcrowded Kennedy. 379 F.Supp. at 437–438. Generally, however, the court was concerned about the focused, knowledgeable resistance to otherwise feasible proposals and opportunities for redistricting.

The district court examined the existing districts in Dorchester for intermediate schools, which are irregularly drawn and do not, in general, coincide with geographical boundaries. As they existed, they maximized racial isolation in the schools while slight changes could have been made which would have been more convenient for students and would also have forwarded integration. 379 F.Supp. at 435. Similarly, elementary schools in the area including that immediately south of South Boston, through Roxbury and into Dorchester, have black districts cut away from predominantly white areas, by an essentially north-south dividing line. The predominantly white schools are located some distance to the east of the dividing line, indicating that the line could, as far as convenience to students is concerned, be readily moved to aid integration. Furthermore, there were several multi-school elementary districts which are segregated according to race within the district with rare exceptions. On no occasion have the city defendants redistricted to eliminate racial imbalance. 379 F.Supp. at 438.[17]

The city's intransigence becomes all too clear when we review the proposals made to it. The Kiernan Report, filed in April, 1965, proposed specific solutions. It was ignored. After the first racial imbalance census taken pursuant to the Racial Imbalance Act, the state Board notified the Committee that it was under a legal duty to remedy imbalance. The first plan submitted suggested no redistricting and was rejected on that basis. Because of the Committee's failure to comply with state law, state funds were held in escrow during the years from 1966 to 1971—a withholding which must have substantially affected the school system's ability to meet the educational needs of those years.

The Committee was not left to its own devices. The state Board asked the Joint Center for Urban Studies at Har-

---

17. Defendants claim that the district court's blanket statement that no redistricting for integrative purposes took place indicates that the court failed to consider evidence that parts of a predominantly white district were added to the John F. Kennedy district for the purpose of improving the racial balance and the Curley Elementary School which was about to open, and that similar redistricting took place upon the opening of the Holland and Ohrenberger schools. We note that the district court did not fail to consider these matters, but included them in its discussion of school openings. When the district court discussed redistricting, it specifically excluded from its definition the original drawing of districts for new schools. 379 F.Supp. at 437.

vard and MIT to submit proposals. Eight alternative redistricting proposals for elementary schools and three for intermediate schools were provided, all being geared to minimize transfers of white students, to avoid long walks for young children, and to avoid the irregular shaping of districts. Safety was a foremost consideration. Kindergarten children were not affected and only junior high students would have had to be bused under the proposals. Various excuses were given for the dogged refusal to adopt the plans. At one meeting of the Committee in 1966, 379 F.Supp. at 439, the chairman continually urged a good faith effort in order to obtain the release of funds, an effort which he felt would have to include redistricting. To launch such an effort, he moved "that the superintendent be directed to review the Joint Center package and 'extract from it those recommendations which you can live with and which are workable and will have the effect of' minimizing racial imbalance." This limited, preliminary suggestion was rejected. The Committee proposed instead plans which would permit city blacks to be bused under Metco to suburban schools in exchange for white students from those schools. The plan was rejected by the state Board, submitted again and rejected again. The funds were still withheld. This process continued as the number of racially imbalanced schools increased steadily from 40 in 1966 to 62 in 1969.

The climax was, in the view of the district court, the Committee's reaction to the Board's rejection of its fourth stage plan in 1971. The Committee countered the rejection by proposals to create an advisory committee to review all district lines, to request technical advice from the Board, and to participate in a committee to oversee development of a "Comprehensive Plan" to eliminate racial imbalance. The Committee, so found the court, appointed strong opponents of balance to the advisory committee, refused access to critical data by the Board, and never appointed members to the committee of oversight. In the dis-

trict court's words, it "sabotaged" the entire effort. It is beyond dispute that the defendants took every opportunity to maintain segregation where it existed and to foster segregation where it did not. To use the Supreme Court's language, "the 'neighborhood school' concept has not been maintained free of manipulation", *Keyes, supra,* 413 U.S. at 212, 93 S.Ct. at 2699, 37 L.Ed.2d 548.

■ We have addressed the facts found and the district court's inferences drawn as to segregative purpose, and have found no error. Moreover, even if the individual instances were not by themselves capable of supporting a finding of discriminatory intent—and we think those addressed were sufficient— they clearly create a definite pattern of intentional segregatory motives and practices. United States v. Board of School Comm'rs of Indianapolis, 474 F.2d 81, 84 (7th Cir. 1973), cert. denied, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973); Davis v. School District of Pontiac, 443 F.2d 573, 576 (6th Cir. 1971). "[T]he courts are not precluded from drawing the normal inference of intent from consciously consummated acts." 474 F.2d at 85. Here that intent was consistent with the expressed motivation. It takes very little alteration of the words of the Supreme Court in describing in Denver school board's actions, found impermissible, to describe accurately the Boston practices:

"First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating 'feeder' schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white. Similarly, the practice of building school[s] . . . in a certain location 'with conscious knowledge that [they] would be . . . segregated . . .' . . . has a substantial reciprocal effect on the racial composition of other nearby schools. So also, the use of mobile classrooms, the drafting of student transfer policies . . . on racially identifiable bases,

have the clear effect of earmarking schools according to their racial composition . . .." *Keyes,* 413 U.S. at 201–202, 93 S.Ct. at 2694.

The district court's findings as to school assignment, building policy, the use of mobile classrooms, and districting and redistricting are thoroughly supported. These findings in turn amply support the findings of segregative intent.

## IV. ADMINISTRATION OF EXAMINATION AND TRADE SCHOOLS, AND VOCATIONAL PROGRAMS

The Boston school system operates three high schools, Boston Latin, Girls Latin and Boston Technical, which serve as college preparatory schools, and which admit students on the basis of competitive examinations. The enrollment at these schools, the district court found, was overwhelmingly white.[18] The city operates two vocational schools, Boston Trade and Girls Trade. These the court found predominantly and increasingly black.[19] There are also a variety of mostly white vocational programs located in regular high schools.

The Supreme Court established in *Keyes* two principles for use when analyzing school segregation in localities with no history of statutorily based separate education. The first is that

"common sense dictates the conclusion that racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions. This is not to say, of course, that there can never be a case in which the geographical structure of or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units. Such a determination is essentially a

question of fact to be resolved by the trial court in the first instance, but such cases must be rare. *In the absence of such a determination, proof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system.* Of course, where that finding is made, as in cases involving statutory dual systems, the school authorities have an affirmative duty 'to effectuate a transition to a racially nondiscriminatory school system.' *Brown II, supra,* 349 U.S. 294, at 301 [75 S.Ct. 753, 99 L.Ed. 1083]." 413 U.S. at 203, 93 S.Ct. at 2695. [Emphasis supplied.]

In short, absent a showing by school authorities that a particular school is geographically isolated, or that the effect of proven deliberately segregative acts was confined to a discrete and discernible portion of the system, every school in a system shown to have been illegally segregated in some respects must be subject to the district court's scrutiny in devising a remedy to eliminate segregation.

The second principle established by the Court in *Keyes* is that, even if there is a determination that part of a district is "separate, identifiable and unrelated":

"[A] finding of intentionally segregative school board actions in a meaningful portion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." 413 U.S. at 208, 93 S.Ct. at 2697.

---

**18.** In 1972 Boston Latin was 2.2% black, Girls Latin was 5.0% black, and Boston Technical was 13.7% black (due in part to an industrial printing program run there which did not admit students on a competitive basis).

**19.** The black enrollment at Boston Trade increased from 9.6% in 1967 to 65.2% in 1972. At Girls Trade the increase was from 35.7% to 68.7%.

"[I]t is not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." *Id.* at 210, 93 S.Ct. at 2698.

■ This presumption, once operative, applies to *any* segregated school, isolated or not, subject to the control of defendant school authorities. They would have the burden of proving the absence of segregative intent.

The district court found no part of the Boston school system to be geographically isolated. Since defendants' policies with regard to new facilities, portable classrooms, overcrowding, districting and redistricting, feeder patterns, open enrollment and controlled transfers, and faculty and staff were all marked by segregative intent, the existence of a dual system was established. The effects of that system, in any school, including the examination and trade schools and the vocational programs, must be eliminated.[20]

■ Even if the evidence of a dual system were not so conclusive, the second principle established by *Keyes* would require, in light of the evidence of intentional segregation elsewhere in the school system, that we presume the segregation in the examination and trade schools and the vocational programs to be intentional. Defendants argue that students were admitted to the examination schools on the basis of an objective standard "having nothing to do" with pupil assignment policies found intentionally segregative elsewhere in the system. Such an "allegedly logical, racially neutral explanation" is not enough. Defendants offer no proof that "segregative intent was not among the factors that motivated their actions".[21] Quite the contrary, there is strong evidence to indicate that the segregation of the examination and trade schools and the vocational programs was intentional.

As we have noted, students in the vocational programs were recruited primarily at white junior high schools. The advanced elementary school classes, whose members usually continued to the examination schools, were over 80 percent white. Further, defendants were aware at least as early as 1966 that whites were much more successful than blacks on the entrance examinations, yet they made no effort to reconsider the appropriateness of the examinations, or to take other steps to encourage minority representation until racial discrimination charges were filed with the Massachusetts Commission Against Discrimination. 379 F.Supp. at 467–468.[22]

The predominantly black trade schools, on the other hand, were described by the man later selected to head a proposed

20. The facts with respect to the examination and trade schools and the vocational programs illustrate the logic of the first principle established in *Keyes*. The schools and the programs are integral parts of the educational system in Boston, fulfilling specialized roles in that system. The examination schools are segregated because black children fare worse on the entrance examinations than whites. These children are products of the segregated elementary classes which constituted "tracks" to the examination schools and were more than 80% white. The predominantly white vocational programs recruited primarily at white junior high schools. Thus, the segregation of the lower schools had inevitable consequences for the examination and trade schools and vocational programs.

21. As we understand *Keyes*, little short of a positive showing that defendants acted with integrative intent would suffice to rebut the presumption of segregative intent. Berkelman v. San Francisco Unified School Distict, 501 F.2d 1264 (9th Cir. 1974), cited by defendants, is wholly inapposite, as the court there specifically noted that there was no showing of intentional segregation in the San Francisco School System to warrant the application of *Keyes*. 501 F.2d at 1266 n. 3.

22. The settlement of these charges led to the use in 1973 of examinations prepared by Educational Testing Services in Princeton, N. J., and the reservation of a number of seats in the examination schools for underrepresented districts of the city. This action has no relevance to defendants' intent in earlier years. *Keyes*, 413 U.S. at 210, 93 S.Ct. 2686.

unified Boston trade and girls trade school as "a philosophy that has failed in Boston". Defendants point to the absence of any finding that the vocational programs were better than the trade schools. That one program was not found to be superior to the other, i. e., that it might be "equal" although "separate", does nothing to refute the evidence that blacks were directed toward the trade schools, whites toward the vocational programs. Here again, disparate bits of evidence have but one unifying theme, the intent to maintain a segregated school system.

## V. POLICIES AND PRACTICES AFFECTING FACULTY AND STAFF

■ The district court found the Boston school system segregated as to faculty, and staff, as well as to students. Although we deal with it last, we do not view it as the least significant aspect of the district court's opinion. Such segregation " . . . [is] among the most important indicia of a segregated system". Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971). Segregative policies with respect to faculty and staff violate the Constitution independently of the segregation of pupils. Rogers v. Paul, 382 U.S. 198, 200, 86 S.Ct. 358, 15 L.Ed.2d 265 (1965); Bradley v. School Bd. of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Swann v. Charlotte-Mecklenburg Bd. of Educ., supra.

The district court found that most of the black teachers in the Boston school system were teaching in schools whose student population was over 50 percent black. In 1972–1973 68 percent of the black teachers were concentrated in the 59 schools (29 percent of the total) which were majority-black. 379 F.Supp. at 459. Further, 81 schools (40.3 percent) had never had a black teacher, and 35 others (17.4 percent) had had only one black teacher in any year since 1967–1968 (the earliest year for which figures were put in evidence). All 19 black administrators were assigned to nine majority-black schools during 1972–1973, and the five black principals were assigned to schools ranging from 66 percent to 97 percent black. While no school had a faculty which was more than 50 percent black, that fact is hardly significant in light of the fact that blacks constituted only 5.4 percent of the permanent teaching staff.[23]

The district court attributed the allocation of black teachers to black schools to three factors: defendants' policy of honoring requests by principals and headmasters for assignment of black teachers to their schools; defendants' transfer policy which allocated vacant positions in order of seniority; and the high proportion of provisional teachers among the black faculty in the school

---

**23.** Defendants argue that when the Supreme Court said in Swann " . . . where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staffs . . . a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown," 402 U.S. at 18, 91 S.Ct. at 1277, it referred only to school systems in which some faculties were majority-black. We think defendants misread Swann. If the Court had intended to establish a mathematical rule it could have done so explicitly. The passage quoted calls for us to determine what the numbers mean in the context of the case before us. Such an approach is entirely consistent with that established by the Court in Keyes for the analogous determination whether a student body is segregated, 413 U.S. at 196, 93 S.Ct. 2686.

Even if we accepted defendants' reading of the Swann language, it would be of little avail, for Swann simply states one basis on which a constitutional violation may be found. It is silent as to the impact of findings such as the district court has made in this case, that the concentration of most of the system's black teachers in the small minority of schools which are dominantly black has resulted from segregatory policies knowingly pursued by defendants.

system.[24] The three factors are interrelated. When a position becomes vacant at a school, it is given to the most senior teacher wishing to transfer to it. If not filled by a transfer, the vacant position is offered to a certified teacher on the eligible list of applicants who have completed the screening process. If no certified teacher fills the vacancy, a noncertified provisional is hired. Thus, the most desirable teaching positions have been occupied by the most senior teachers, the least desirable by the less senior teachers, the provisionals getting the residue. Positions in identifiably black schools have been regarded as less desirable. Thirty nine transfer requests were granted in 1971 and 1972 for teachers wishing to leave majority black schools to go to majority white schools. None went the other way. Since only about one percent of teachers in the school system in the early 1960's were black, and many of the black teachers were provisionals, a very small number of black teachers were in a position to transfer to those teaching positions deemed most desirable. Although the Superintendent had the power to make or deny transfers for the good of the school system, and could have utilized this power to balance the distribution of black teachers, the district court found that he had not done so. The personnel department did, however, seek to honor the requests of school principals and headmasters that black teachers be assigned to their districts, a policy which had a segregative effect.

Defendants contend that black teachers' commitment to the education of black children, and the need of black children for black adult role models justified the concentration of black teachers in majority-black schools. As to the first contention the district court, after first noting the absence of evidence of any special interest on the part of blacks for such assignments, observed that the constitutional ban on segregation could not in any event yield to the desires of black teachers or parents. As to the second contention, the court found no systematic inquiry or empirical data to support it, and no evidence that this concept played any part in matching the races of teacher and pupils. Our own review of the record entirely supports the district court.

The result of defendants' practices was not only to concentrate most black teachers in black schools, but also to place in those schools a lower proportion of experienced teachers and a higher proportion of provisionals. We do not understand defendants to dispute these findings.

The district court also found that defendants discriminated with respect to hiring and promotion. In 1970–1971, 3.5 percent of the professional staff in the Boston school system was black. As we noted at the beginning of this section of the opinion, in 1972–1973 all of the black administrators in the school system were assigned to predominantly black schools. Promotions to administrative positions were granted on the basis of a "rating" system which gave up to 600 points for credentials and up to 200 points on the basis of a personal interview. 760 points were necessary for a candidate to be "rated". Two prerequisites were a score of at least 70 percent on an essay examination administered by the board of examiners, and four to six years employment in a permanent position in the school system. Lists of candidates "rated" for a particular position were compiled every three years, effective for three years. The effect of the requirement of four to six years' experience in a permanent position, and of the three year duration of the "rated" lists was to

---

**24.** About 15% of the total teaching staff in the school system were provisionals. 35% of the black teachers were provisionals. Provisionals are hired under an exception to the requirement that teachers in Massachusetts have teaching certificates. They need not have taken the National Teachers Examination, nor have achieved a good score if they have taken it. They are hired under one year contracts at lower pay than permanent teachers, receive tenure only if hired for three consecutive years, and have no rights of transfer or promotion. 379 F.Supp. at 457, 460.

imbed in the administrative staff previous discrimination in the hiring of black teachers.[25] The district court concluded that, at least by 1970, defendants were aware of this fact.[26]

Until 1968 candidates for permanent teaching positions in the Boston school system were required to score 70 percent or better on the Boston Teachers Examination. Between 1968 and 1970, candidates were permitted to use either a Boston Teachers Examination score, or an equivalent score (560) on the National Teacher Examinations (NTE) prepared by the Educational Testing Service (ETS). After 1970 all candidates were required to take the NTE.[27] Those candidates achieving the requisite score were then ranked according to a composite score which factored in the results of an interview, the candidate's credentials and the test score. This composite score, the district court found, almost always corresponded to the test score, the interview and the candidate's credentials having no practical effect on the candidate's ranking. Defendants were aware that blacks tended to score lower than whites on the NTE, that exclusive reliance on NTE scores for hiring purposes either through the use of a "cutoff" score, or by ranking according to scores was discouraged by ETS and had the effect of discriminating against blacks, and that the NTE has never been shown to have substantial predictive validity (high test scores do not indicate ability to teach). 379 F.Supp. at 464.[28]

In Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972), we held that "[t]he public employer must . . . in order to justify the use of a means of selection shown to have a racially disproportionate impact, demonstrate that the means is in fact substantially related to job performance. It may not, to state the matter another way, rely on any reasonable version of the facts, but must come forward with convincing facts establishing a fit between the qualification and the job." The district court was fully supported by the evidence in concluding that defendants' use of the NTE had a racially disproportionate impact, and that no showing was made that the NTE was "substantially related to job performance". Walston v. County School Board of Nansemond County, Va., 492 F.2d 919 (4th Cir. 1974); Baker v. Columbus Municipal Separate School Dist., 329 F.Supp. 706, 714–715 (N.D.Miss.1971); see also Boston Chapter, N.A.A.C.P. v. Beecher, 504 F.2d 1017 (1st Cir. 1974).

Quite apart from its independent significance, defendants' use of the NTE adds another strand to the fabric which binds the elements of this case together. The discriminatory hiring practices, segregative assignment and transfer policies, and the promotion system which perpetuated in administrative positions the effects of discriminatory hiring, have further combined to buttress the segregated nature of the school system. Their cumulative effect was to

---

**25.** Defendants argue that the evidence does not show that the "rating" system itself was segregative. We agree. We do not know the number of blacks or of whites who sought to be "rated", nor the success rate for either group. We do not know what percentage of "rated" blacks, as opposed to "rated" whites actually received promotions. We do know that the black 3.5% of the administrative staff in the school system must, as a consequence of the 4–6 year experience requirement and the three year life of the "rated" lists, have come from among teachers who were employed in the early sixties, a time when less than 3.5% of the teachers were black.

**26.** The "rating" system was suspended in 1971. The district court found that the thirty

acting appointments made from 1971 until the time of the trial had all been filled by whites.

**27.** In 1972 the required score was reduced to 400, and in 1973, to 320.

**28.** Defendants argue that if the NTE is somewhat related to teaching competence, its use as a part of the hiring process is legitimate. The district court found, however, that the NTE was in practice the only hiring criterion, and that the use of the "cutoff" score of 560 was inherently discriminatory. See Walston v. County School Bd. of Nansemond County, Va., 492 F.2d 919 (4th Cir. 1974), where the Fourth Circuit, in an opinion by retired Justice Clark, ruled unconstitutionally discriminatory an NTE "cutoff" score of 500.

isolate black students, black teachers and black administrators in a limited number of schools, thereby denying to those students the equal educational opportunity to which they are constitutionally entitled. Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra*; United States v. Montgomery County Bd. of Educ., *supra*. Faculty segregation, which is uniquely amenable to the control of school authorities, Kelly v. Guinn, 456 F.2d 100, 107 (9th Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3048, 37 L.Ed.2d 1041 (1973), is a significant element in a racially discriminatory system which must be " . . . eliminated root and branch". Green v. County School Bd. of New Kent County, 391 U.S. 430, 438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ Moreover, as the district court properly found, the result of defendants' policies as to transfer, assignment, and placement of provisional teachers was to allocate to the schools attended by most black children the least experienced and least credentialed teachers, and to cause a rate of faculty turnover at predominantly black schools far higher than that at white schools. We affirm the district court's conclusion that these policies operated to deny to plaintiffs the equal education to which they are entitled.[29]

## VI. CONCLUSION

Having considered all arguments given to us in the briefs and at oral argument, and having read the materials submitted to us by the parties, we are of the opinion that the district court gave the most deliberate and sensitive attention to this traumatic issue. More pertinently, in the light of the ample factual record and the precedents of the Supreme Court, we do not see how the court could have arrived at any other conclusion. We cannot fail to be aware of the unrest that attends any moment when change in old approaches is at last mandated by court decree. But while Boston is unique in some of its traditions, demographic profile and style, its uniqueness cannot exempt it from complying with a national policy forged long ago and laboriously implemented throughout the land. The poet, Robert Lowell, wrote of the Beacon Hill statute commemorating the young white Colonel Shaw and our first black regiment, commissioned in 1863, "Their monument sticks like a fish bone in the city's throat."[30]

This is not the first time that a city has been riven with controversy over the implications of ending segregation in public schools. Mr. Justice Frankfurter, concurring in Cooper v. Aaron, 358 U.S. 1, 25, 78 S.Ct. 1401, 1413, 3 L.Ed.2d 5, 19 (1958), wrote words that are as pertinent today as they were sixteen years ago:

> "Deep emotions have . . . been stirred. They will not be calmed by letting violence loose . . . submitting to it under whatever guise employed. Only the constructive use of time will achieve what an advanced civilization demands and the Constitution confirms."

And the constructive use of time necessarily depends upon "the fruitful exercise of the responsibility of those charged with political official power." *Id.*

The judgment of the District Court is affirmed.

---

**29.** Plaintiffs suggest that the denial of equal education would constitute a violation of the Equal Protection Clause independently of any finding of racial segregation. We do not reach that question. The evidence of racial segregation in the Boston schools is too massive to suggest that we pursue alternative theories. Equal educational opportunity has been the central theme of all of the generations of school desegregation cases beginning with *Brown*.

**30.** Robert Lowell, *For the Union Dead.*