Craton LIDDELL, et al., Plaintiffs,

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI, et al., Defendants.

No. 72–0100C(5).

United States District Court, E.D. Missouri, E.D.

July 18, 1989.

William P. Russell and Joseph McDuffie, St. Louis, Mo., for Liddell et al., plaintiffs.

Michael A. Middleton, Columbia, Mo., William L. Taylor, Washington, D.C., and Wayne C. Harvey, St. Louis, Mo., for Caldwell/NAACP, plaintiffs.

Kenneth C. Brostron, Lashly Baer & Hamel, St. Louis, Mo., for City Bd. defendants.

Michael J. Fields and Bart A. Matanic, Asst. Missouri Attys. Gen., Jefferson City, Mo., and H. Bartow Farr, III and David R. Boyd, Onek Klein & Farr, Washington D.C., for State of Mo., defendants.

Andrew J. Minardi and Joseph D. Ferry, St. Louis, Mo., for St. Louis County defendants.

Shulamith Simon, St. Louis, Mo., court-appointed, amicus curiae.

Robert M. Lucy and Joseph Colagiovanni, Bryan Cave McPheeters & McRoberts, St. Louis, Mo., for St. Louis Community College.

Craig M. Crenshaw, Jr. and Jeremiah Glassman, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for the U.S.

James J. Wilson, St. Louis City Counselor, St. Louis, Mo., for City of St. Louis.

Anthony J. Sestric, St. Louis, Mo., for St. Louis Collector of Revenue.

Charles Werner, St. Louis, Mo., for Missouri NEA.

Charles R. Oldham, St. Louis, Mo., for St. Louis Teachers Local Union 420.

Robert Bartman, Com'r, Missouri Dept. of Elem. & Sec. Educ., Jefferson City, Mo., for Missouri Dept. of Elementary & Secondary Educ.

Henry D. Menghini and Robert J. Krehbiel, Evans & Dixon, St. Louis, Mo., for St. Louis County School Districts, Affton & Lindbergh.

Darold E. Crotzer, Jr., St. Louis, Mo., for Bayless, Jennings, Normandy & Wellston.

Bertram W. Tremayne, Jr., St. Louis, Mo., for Kirkwood & University City.

Frank Susman, Susman Schermer Rimmel & Parker, St. Louis, Mo., for Ferguson–Florissant.

George J. Bude, St. Louis, Mo., for Brentwood, Clayton & Hancock Place.

Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood.

Robert G. McClintock, St. Louis, Mo., for Ladue.

Richard H. Ulrich, Summers Compton Wells & Hamburg, St. Louis, Mo., for Maplewood–Richmond Heights.

John Gianoulakis, Kohn Shands Elbert Gianoulkis & Giljum, St. Louis, Mo., for Mehlville, Pattonville & Ritenour.

Donald J. Stohr, James W. Erwin, and R.J. Robertson, Thompson & Mitchell, St. Louis, Mo., for Parkway.

Edward J. Murphy, Jr. and Garry Seltzer, St. Louis, Mo., for Riverview Gardens.

Douglas A. Copeland and Robert W. Copeland, St. Louis, Mo., for Rockwood & Webster Groves.

Joseph Niemann, Eric Schmitz, and Jordan Cherrick Armstrong Teasdale Schlafly Davis & Dicus, St. Louis, Mo., for St. Louis County Special.

Kenneth V. Byrne, Schlueter & Byrne, St. Louis, Mo., for Valley Park.

## MEMORANDUM

LIMBAUGH, District Judge.

This matter is before the Court on the City Board's Student Reassignment Plan for 1989–90, Phase 1 and the Comprehensive Student Reassignment Plan, L(2368)89 and L(2446A)89, respectively. Numerous responses have been filed, including submission of another student reassignment plan by the State. State's Consolidation Motions—L(2385)89 and L(2386)89; L(2419)89, L(2429)89, L(2459)89, L(2482)89 and L(2484)89. The City Board has filed replies to the responses to its plan(s) and to

the State's Consolidation Motions, L(2441)89, L(2457)89, and L(2502)89. Missouri National Education Association, St. Louis Teachers' Union, Local 420 and the Education Monitoring and Advisory Committee (EMAC) have filed responses to the State's plan, L(2434)89, L(2435)89 and L(2448)89 respectively. In connection with the student reassignment matter, the State has filed a motion for production of data, L(2433)89. The City Board has filed a response, L(2451)89, to which the State has responded, L(2466)89.

In Order L(2041)88 this Court directed the City Board to draft a comprehensive student reassignment plan, ready for implementation in the fall of 1989. The Court clearly expressed its belief and desire that only the City Board present such a plan for court approval. However, the State took it upon itself to invest a considerable amount of time and money for outside counsel to draft a student reassignment plan which contravenes this Court's directives.

■ Nevertheless, the State's plan is commendable. It is a comprehensive effort which addresses many of the concerns of this Court and the Court of Appeals for the Eighth Circuit. However, in its desire to achieve maximum consolidation cost reductions, the State has gone beyond reasonable reconfiguration of the school system. The State's plan is simply too drastic. It proposes massive disruption of students' lives by closing or converting a substantial number of schools beyond what this Court has previously ordered. It closes fifteen (15) non-integrated and four (4) integrated elementary schools; closes/converts eight (8) non-integrated and four (4) integrated middle schools; converts three (3) non-integrated high schools. It appears that approximately 35% of currently operating schools would be closed or converted, with a majority of these schools being all black. Staffing would be cut back to bare minimum—sufficient only to meet AAA requirements. Little is mentioned regarding staffing to carry out desegregation programs. The implication is that these programs will be reduced or eliminated also.

The State's plan is extremely comprehensive and cost-effective, and therein lies its major flaw. It lacks a human touch. Children and their teachers are not just computer-generated statistics. These are living human beings who deserve something more than being packed like sardines into as few cans as possible. The Caldwell plaintiffs asked the question that this Court must consider. Is belt tightening in education always the only solution? Obviously, the State's plan demonstrates significant cost savings, but at too great a cost to the students and teachers? The cost in disrupting so many lives is too high a price to pay in order to achieve financial savings.

■ The Court directed only the City Board to develop a student reassignment plan because of the well-established principle in desegregation cases, that deference should be given to local school officials regarding educational matters. *See, Liddell VII v. State*, 731 F.2d 1294, 1317 (8th Cir.1984); *Morgan v. McDonough*, 689 F.2d 265, 276 (1st Cir.1982); *Davis v. School District of the City of Pontiac, Inc.*, 443 F.2d 573, 577 (6th Cir.1971), *cert. den.*, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971); *NAACP v. Lansing Board of Educ.*, 429 F.Supp. 583, 631 (W.D.Mich. 1976), *aff'd*, 559 F.2d 1042 (6th Cir.1977), *cert. den.*, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978); *re-aff'd*, 581 F.2d 115 (6th Cir.1978). The City Board still possesses the sole responsibility of administering its school system, and reconfiguring the school system is part of that responsibility.

However, carrying out this responsibility is contingent upon abiding by the court findings and directives which the City Board has failed to do. In its response to the State's consolidation motions, the City Board attempts to justify its "revised" enrollment projections and building capacity figures. It spent a considerable amount of time analyzing different methodologies in order to "reassess" the enrollment projections and building capacities already decided upon by the Court in L(1570)87 and L(2090)88. This was not its assignment. The City Board was directed to develop a

student reassignment plan ready for 1989–90 implementation, based upon the already determined enrollment projections and building capacities. Instead, the City Board spent months creating computer-generated enrollment projections through the year 2000. After generating all this computer data, its figures are still incorrect and unrealistic.

For brevity's sake, the Court will concentrate on the defects in the Phase 1 proposal (it is the foundation of the overall plan, and since it is seriously flawed, the rest of the plan fails to stand).

First, the total enrollment after reassignments exceeds the enrollment before reassignments. The projected enrollment before reassignment is 29,835, while the projected enrollment after reassignment is 29,965 (elementary and middle school students only). The following are just a sample of the erroneous nature of the City Board's data:

*Peabody Elementary.* In L(2367)89 at 11, 13 and 14, the Board proposes to change the K–8 grade structure at Peabody to K–5 by sending 90 students in grades 6–8 to Blewett Middle School. L(2368)89, page 9, shows Blewett projected enrollment increasing by the 90 students transferred from Peabody. However, there is no corresponding reduction at Peabody. Peabody enrollment before student reassignment is shown at 416 (includes grades 6–8). The Board projects 445 students at Peabody after it receives 29 students from Jackson.

*Reassignment at Carr Lane, Ford and Washington.* In L(2367)89, page 15 and L(2368)89, page 14, the Board projects Carr Lane 1989–90 enrollment before student reassignment at 170. It proposes to transfer 138 students to Ford and 32 students to Woodward. Additionally, the Board proposes to transfer 10 students to Carver and 20 students to Sigel. The 20 students transferring to Sigel are included in the projected enrollment after reassignment. *See* L(2368)89, page 17. However, the 10 students transferring to Carver are not included. See L(2368)89, page 14. The Board projects Carr Lane enrollment at 170 students before reassignment and then proceeds to reassign 200 students.

The Board proposes to convert Ford Middle School to a nonintegrated elementary school and to reassign Ford Middle School students to King, Stowe, Cook and Hickey Middle Schools. *See* L(2367)89, page 17. The Board projects Ford 1989–90 enrollment at 246 and proposes to reassign these 246 students. L(2367)89, page 18, shows Ford Middle students in the projected enrollments at King, Stowe, Cook and Hickey after reassignment. The Board also proposes to transfer 50 handicapped students from Ford to Fanning, Grant and Columbia. These students are not included in the enrollment after reassignment at the receiving schools. Students received at Fanning and Grant would change totals at integrated and nonintegrated schools, if included in projected enrollments. The Board projects 1989–90 enrollment at Ford at 246 students and then proceeds to transfer 296 students.

The Board projects 352 enrollment at Washington before reassignment. It also proposes to transfer 352 students to Langston, King and Stevens. These are included in the reassigned enrollments. Additionally, the Board proposes to transfer 50 handicapped students to Simmons, Williams, Yeatman, Clinton and Columbia. These are not included in the reassigned enrollments. The transfer to Clinton would change the total enrollment at integrated and nonintegrated middle schools. The Board projects Washington enrollment at 352 before student reassignment and proceeds to transfer 402 students.

*Reassignment of special education students.* The Board proposes to relocate 195 special education students, L(2367)89, page 21. Forty of the 195 students are included in the receiving schools' projected enrollment after reassignment, and 155 are excluded. Dewey Middle is transferring 35 students to Nottingham, Grant and Webster. Nottingham and Webster enrollment after reassignment includes 20 students; how-

ever, the 15 students transferring to Grant are excluded. Carr Lane is transferring 30 handicapped students to Carver (10) and Sigel (20). Sigel includes the 20 students in the reassigned enrollment, but the 10 students to Carver are excluded.

Second, further review of the City Board's projection indicates minimal consideration of the impact of the effect of regular students transferring to fill the expanded magnet targets and city-to-county transfer students. The City Board faults the State for exaggerating the impact of the magnet system. However, the reasons offered by the City Board to minimize the impact are unrealistic. There is no evidence to indicate that the magnet schools will be flooded with private students or that families will begin to move into the city in substantial numbers in order to enroll in magnets. Rather, the data indicates that the impact of the magnet system will be felt primarily by the regular school system in that enrollments will either decrease or stabilize (for the near future) with available building capacity increasing correspondingly.

Third, the City Board continues to ignore certain realities. Their enrollment projections are unacceptably inflated. For example, the City Board projects a 14% increase in regular high school enrollment for 1990. High school enrollment has been declining since the 1960s. City Board provides little, if any, data to suggest a major reversal in this trend.

Finally, the Court is gravely concerned over the City Board's "revised" building capacity figures. In many cases, such as Gundlach Elementary, City Board's building capacity exceeds Order L(1570)87 capacity; while in other cases, such as Mitchell, it sets a lower building capacity than Order L(1570)87. Whatever standard the City Board is using is a mystery. However, it does appear than it is converting instructional rooms reserved by L(1570)87 for art, music, special education and enrichment labs. Furthermore, the City Board appears to be adjusting the scheduling factor already incorporated in the building capacity figures of Order L(1570)87. For example, the City Board calculates middle-school capital by introducing an 86% scheduling factor. The room utilization rate in Order L(1570)87 mid-school capital has already been reduced to 85.7% to accommodate a 6 out of 7 instruction-period day. The City Board is reducing capacity by an additional 14% by applying its 86% scheduling factor to the 6 out of 7 period scheduling used in Order L(1570)87. Thus, the City Board is essentially scheduling 5 of 7 periods per day.

■ This Court is committed to the principal of allowing the City Board to administer its school system. However, this is a conditional privilege granted by the Court as a result of this litigation and not an unconditional right possessed by the City Board. Every leniency was given the City Board in order to assist it in formulating a comprehensive student reassignment plan. Unfortunately, the City Board has been unable to produce. Yet the Court desires to give the City Board one more opportunity to carry out this task; however, the Board will do so under specific conditions and with assistance.

Representatives of the City Board and the State shall meet with Dr. Warren Brown in order to develop a comprehensive reassignment and consolidation plan, for implementation in 1990–91, designed to achieve all the goals already articulated by this Court and the Court of Appeals for the Eighth Circuit. This plan shall accomplish the reduction of pupil-teacher ratios, full implementation of all other quality education components, provide enhanced integrated educational environments, and demonstrate downsizing and cost-efficiency. Orders L(1570)87 and L(2090)88 did not merely set forth the court-approved methodology for enrollment projections and building capital. It also pronounced the enrollment figures and building capacities to be utilized in developing the student reassignment plan.

The revised plan shall address specifically how it incorporates and accommodates specific court orders. Any deviations from court orders, regarding enrollment projec-

tions, building capacities, etc., must be thoroughly documented and justified.

The City Board and the State shall work together cooperatively. It is quite apparent that each party possesses an expertise that needs to be pooled in order to develop a quality feasibility plan. The City Board is in a better position than the State to contribute data and opinions both effective and sensitive to the needs and concerns of the students, parents, and teachers of the city school system. The State, on the other hand, has admirably demonstrated its ability to computer-generate realistic statistical data and use this data for meaningful long-term planning. The Court wants an exchange of data, information and ideas. With Dr. Brown's assistance, the Court expects a single plan developed by efforts of both the City Board and the State which departs from the status quo, but does not involve massive disruption throughout the school system.

The Court directs the City Board and State to relinquish their antagonistic attitudes and work together for the best interests of the children attending St. Louis city public schools. If either party cannot comply, then this Court will select a committee of persons able and willing to carry out this assignment.