**Tallulah MORGAN et al., Plaintiffs,**

**v.**

**John A. NUCCI et al., Defendants.**

**Civ. A. No. 72–911–G.**

United States District Court,
D. Massachusetts.

Feb. 20, 1985.

Larry Johnson, Robert Pressman, Center for Law and Educ. Gutman Library, Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Caroline Playter, Kehoe, Doyle, Playter, Novick & Strimaitis, Boston, Mass., Kenneth Kimmerling, Puerto Rican Legal Defense & Educ. Fund, Inc., New York City, for El Comite.

Robert Blumenthal, State Bd. of Educ., Quincy, Mass., Robert H. Bohn, Jr., Sp. Asst. Atty. Gen., Gitlin, Emmer, Kaplan & Bohn, Boston, Mass., for State Bd. of Educ.

Steven P. Perlmutter, Asst. Corp. Counsel, Boston, Mass., for Mayor, City of Boston.

James T. Grady, Grady, Dumont & Dwyer, Boston, Mass., for Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS–Boston Association of School Administrators and Supervisors.

Martin A. Walsh, Community Relations Service, Boston, Mass., for Community Relations Service.

Lucille Koch, Evalena Higginbottom, Acting Co. Executive Directors, City Wide Parents Council, Boston, Mass., for Transition Committee.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Michael Betcher, Boston, Mass., for Boston School Committee, Maura McGroarty, Boston School Committee, Dept. of Implementation, Boston, Mass., for Boston School Committee and Boston School Dept.

Nancy Gertner, Silvergate, Gertner, Baker & Fine, Boston, Mass., Herbert Henderson, N.A.A.C.P. Spec. Contribution Fund, Brooklyn, N.Y., for Concerned Black Educators of Boston.

Henry C. Dinger, Goodwin, Procter & Hoar, Boston, Mass., and Thomas I. Atkins, Brooklyn, N.Y., for School defendants.

## MEMORANDUM AND ORDERS ON PROPOSED MODIFICATIONS OF STUDENT ASSIGNMENT PLAN

GARRITY, District Judge.

These orders represent the conclusion of a process which began on December 20, 1984 with the filing by the school defendants of two motions for modification of the student assignment plan. The first motion contained ten separate proposed modifications and the second requested leave to create a neighborhood school assignment pattern in districts 3 and 4 with desegregation accomplished only through voluntary transfers. The other parties filed objections and comments on the proposed modifications, and hearings were held on January 14, 15 and 17 and February 5 and 11, 1985.

In prior orders in open court, the court granted subdivisions 1, 2, 3, 5 and 10 of the first motion, with certain modifications and conditions. In most cases the court's order approving the modification was issued after agreement on the meaning, intent and impact of the proposals was reached by the parties. Subdivision 7 of the proposed modifications, which concerned the conversion of the Umana High School from a

citywide District 9 magnet to a District 8 middle school, was rejected by the court.

The subjects of these orders are (a) subdivision 7, the school defendants' motion to reconsider the Umana proposal, (b) subdivision 6, which proposes to add grade six to the examination schools, (c) subdivision 9, which seeks leave to create a program of recruiting students for a small number of reserved seats in certain schools, and (d) the separate motion to create a new assignment plan for Districts 3 and 4.[1]

That it was necessary for the court to hold days of hearings extending almost two months from the original filing deadline for these motions and for the parties to file numerous documents and expend substantial amounts of time merely trying to understand the proposals and their impact on desegregation in the Boston public schools, underscores the hastiness and carelessness with which the proposals were brought before the court and parties for consideration. It appears that the school defendants completely ignored their obligations under the law of this case, as set forth in detail in the Orders of Disengagement issued by the court on December 23, 1982. These orders require that proposed modifications of existing orders "have been previously presented to all other parties ... and made the subject of negotiations under the auspices of the State Board." It was obvious from the objections and comments filed by the parties that few, if any, of these proposals had ever been seen by, much less negotiated among, the other parties. It is clear that such negotiations would not have been a useless formality, first, because agreements were worked out in open court after the proposals and their impact on desegregation were clarified and, in several instances, after the school defendants modified their motions in response to objections by other parties. Secondly, the negotiation process succeeded last year in producing a major modification of the court's February 24, 1976 order governing rating and screening of administrative personnel.

More significant in the context of the present orders is the school defendants' failure to comply with the court's order included in the Orders of Disengagement that proposed modifications be "detailed, complete, and include an analysis of their impact on the educational rights of minority students under the Fourteenth Amendment." As the court noted on several occasions during the hearings on these matters, the proposals are lacking in detail and contain only the most conclusory analysis of their desegregative impact.

Through subsequent filings and testimony at the hearings and in the interest of expediency, those proposals which were relatively less complex and less controversial in their impact on plaintiffs' rights were brought to a resolution despite their initial shortcomings. The proposals concerning the Umana and the exam schools continue to suffer from lack of detail and analysis to such an extent that the court is unable to find that the plaintiffs' rights have been sufficiently addressed and protected.

### Umana School

■ The school defendants have requested that the court reconsider its earlier denial of subdivision 7, the proposed conversion of the Umana School from a citywide magnet school to a community district 8 middle school. The court rejected the original proposal because it sought to dismantle the most important and successful opportunity for students to attend a desegregated school located in district 8 without proposing any alternative plan for preserving desegregation there. Despite the school defendants' assertion in the original proposal that "a comparable level of desegregation" would be maintained in district 8, there was not the slightest suggestion of how this would be accomplished except for a passing and cryptic reference in testimony on January 14 to desegregative "assignment potential ... in one form or another".

The school defendants now seek reconsideration because the court's prior deci-

---

1. Decision on subdivision 8 pertaining to Hernandez-model schools awaits further filings due February 22, 1985, and subdivision 4 regarding computation of racial/ethnic guidelines is under advisement.

sion was based on the assertedly mistaken view that the school defendants had no plan to maintain the desegregation of the Umana. We are now informed in the motion to reconsider that "a magnet component is an integral aspect of this proposal." Yet the court and the parties are not given a clue as to what this "integral aspect" of the proposal would actually achieve. Approximately 400 seats at the Umana would be unoccupied by East Boston middle school students and would be reserved for a magnet program. The only other information regarding the proposed magnet is that it may be composed in a manner similar to the business magnet at East Boston High School.

The court does not doubt that the creation of a viable middle school magnet program at the Umana may be possible under some circumstances. However, the court has a responsibility to base approval of a modification on more than a possibility, especially when a certain result of the proposal is the immediate, irretrievable loss of a successfully desegregated school in an area which has proved difficult to desegregate. The court's obligation, "as it always has been, ... [is] to assess the effectiveness of a proposed plan in achieving desegregation." *Green v. School Board of New Kent County,* 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716. An assessment of the effectiveness of a middle school magnet at the Umana is impossible on the current record.

Fundamental questions such as the nature of the proposed magnet program, applicable racial/ethnic guidelines, procedures governing admissions, the prospects for funding the expected changes in the facility and equipment necessary to make the magnet viable, the amount of shared curricula between regular and magnet students, and the readiness of Technical High to accommodate and educate students transferred from Umana in the fall of 1985, are all left unanswered.

General assurances of the school defendants that they will develop a functioning magnet program which is capable of attracting minority students to East Boston are inadequate. Before a program which has proven effective is dismantled, it is the plaintiffs' constitutional right to demand, and the court's responsibility to ensure, that the proposed magnet has a substantial likelihood of succeeding in achieving its objectives. Not every magnet is successful. The experience with the East Boston High business magnet is an example of the careful planning and community involvement which is necessary to realize the desegregative potential of a magnet in a community which is geographically isolated and has a neglible number of black residents. Extensive discussions and specific planning for a magnet component at East Boston High began, pursuant to the court's order of May 3, 1976, a full year and a half prior to its implementation in September of 1977. It is this sort of negotiation and planning that the December 23, 1982 Orders of Disengagement require.

On the other hand, the school defendants have identified several advantageous aspects of their proposal were it to succeed: it would eliminate a racially identifiable middle school, the Barnes; it would remove the occasion for expending substantial funds to renovate the Barnes; and it would enable resources and energy to be concentrated on improving the science education at Technical High. These .aspects of the proposal may be sufficient justification for adoption of the Umana modification at some future date.

### Examination Schools

Subdivision 6 of the school defendants' motion is a proposal to add grade six to the Boston Latin School and Latin Academy and grades six through eight to Boston Technical. This proposal, though significantly less sweeping than the Umana School proposal, still lacks crucial information on the extent of the impact of this change in grade structure on the overall desegregation of the Latin schools and on the ability of the school defendants to maintain desegregation at the sixth grade at the non-exam schools in the system. Despite repeated requests and opportunities to lay such questions to rest, including

a request by the court for proposed findings of fact, the school defendants have failed to do so. With respect to the Boston Technical School, the proposal fails to articulate any desegregative or educational justification for adding a middle school component to that school.

The court has never questioned the prerogative of the school defendants to make changes in the grade structure at the Latin schools, "for educational reasons ... so long as they assure and do not impede desegregation at all grade levels. *Morgan v. Kerrigan,* D.Mass.1975, 401 F.Supp. 216, 244–45, *aff'd,* 1 Cir.1976, 530 F.2d 401, *cert. denied,* 1976, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386. However, no showing has been made that this change will not impede desegregation at all grade levels. Although the school defendants have not sought to change the current 35% minimum of black and hispanic representation required in the entrance grades (currently grades seven and nine) at the exam schools, the plaintiffs, plaintiff-intervenors and State Board all raise the objection that the disproportionately low rate of retention of black and hispanic students would be exacerbated by expanding the Latin schools to the sixth grade. This low retention rate and the inadequacies of the school defendants' response is well documented in all four monitoring reports filed by the State Board. The proposed findings of facts submitted by the school defendants do not address this concern and therefore the school defendants' requested ruling of law that the proposal "will have no adverse impact on desegregation at the examination schools" continues to lack an adequate factual foundation.

More importantly, the record is insufficiently developed to enable the court to make any findings regarding the impact of the proposal on desegregation of sixth grades throughout the rest of the system. The primary objective of the proposal is to remove an obstacle to admission to the Latins by Boston public school students, that is, the necessity of their competing for admission with private school students while in the midst of adjusting as sixth graders to a new middle school. If this objective is achieved, more public school students will be admitted to the Latins and, assuming current racial percentages of those entering the Latins remain unchanged, a disproportionately greater number of white students will be drawn from public middle schools. A substantial decrease in the number of white sixth graders at non-exam middle schools could impede meaningful desegregation at those schools. In addition, plaintiff's counsel has pointed out that the school defendants proposal may accelerate the current trend toward concentration of white students in the Latin schools, stating that if the proportion of white students making up the Latin schools' population remains constant, 43% of all white seventh through twelfth graders in the public schools will be attending these two schools by 1988.

However, since the necessary factual analysis of the desegregative impact of this proposal can be readily accomplished by the school defendants, the court will defer decision on this matter.[2] Although the impact of the proposal cannot be ascertained with a final degree of certainty, it can surely be addressed to an extent that will allow the court and parties, including the school defendants themselves, to gauge whether affirmative action in the form of expanded and intensified efforts to improve retention rates or to better prepare black and hispanic students to compete for admissions is necessary to protect plaintiffs' and plaintiff-intervenors' rights. Such a factual analysis may also show that the negative desegregative impact of the proposal outweighs its educational benefits.

In connection with the evaluation of the educational benefits of the proposal, the school committee may wish to consider further the extensive list of criticisms of the proposal which have been filed with the court by the citywide and school parent councils, individual parents, the Latin Schools' associations, the headmaster of

---

**2.** Deferment of decision on this matter will not affect the filing of the Unified Facilities Plan which is due on March 15, 1985.

the Latin School and other concerned members of the community. These criticisms address the inadequacies of the Latin schools' facilities and staff to accommodate sixth grade students and the educational and pedagogical drawbacks of the proposal. Whatever the merits of these criticisms, and they seem to have merit, they are essentially educational quality issues and, as such, are beyond the proper limits of the court's involvement in the affairs of the school system. *Morgan v. McKeigue,* 1 Cir.1984, 726 F.2d 33, 34. The obligation to make decisions which affect only the quality of education for all students rests solely with the superintendent and school committee.

■ The school defendants' motion as far as it seeks to add grades six through eight to Boston Technical High School is denied. Unlike the addition of grade six at the Latin schools, absolutely no desegregative nor educational justification for this aspect of the proposal has been advanced. In fact, any mention of Tech in connection with the pending motion was conspicuous in its absence, both at the hearing on January 14, 1985 and in the proposed findings of fact and conclusions of law submitted by the parties. The only reason suggested by the school defendants, or any other party, for transforming the grade structures at the examination schools was the burden placed on Boston public school students by having to enter into competition for admission at grade seven in the midst of adjusting to a new middle school at grade six. Boston Tech students currently enter at grade nine, and thus are not subject to this asserted burden. The grade nine through twelve structure of Tech is consistent with most of the high schools in the system. Any need for accommodating middle school students transferring from Umana has been obviated by the court's denial of that proposal.

Balanced against this total lack of justification for including a middle school component at Tech is the detrimental impact of adding 800 middle schools seats to a system which continues to be handicapped by a substantial number of excess seats at the middle school level despite the recent closing of two middle schools. Should the school defendants revive and the court approve their motion to add a sixth grade at the Latin schools, the problem would be even more serious. Currently, the Lewis, Shaw and Gavin middle schools operate at less than 60 percent of their capacities as established by the Department of Implementation in May 1984. The adverse impact of half-empty schools on desegregation and the authority of the court to eliminate them are part of the law of this case. *Morgan v. McDonough,* 1 Cir.1982, 689 F.2d 265, 278, n. 22. See generally, *United States v. DeJesus,* 752 F.2d 640 (1 Cir. 1985).

### Recruitment for Reserved Seats

■ Subdivision 9 of the school defendants' motion, modified in a supplemental memorandum filed January 29, 1985, seeks to fill a small number of reserved seats in 27 named schools by recruiting students whose presence would enhance the desegregation of the receiving school without impeding the desegregation of the sending school. Such students would be recruited without regard to their district or geocode. In many ways this proposal represents an adaptation of the policy of encouraging transfers for desegregation first introduced by the court in its student assignment plan issued May 10, 1975. Subdivision 9, as modified, was adopted in principle during the hearing of February 11, 1985, with the assent of the parties. At that hearing, the school defendants sought to add 31 more schools to the list of 27 schools submitted to the parties and the court. This last-minute modification is rejected because of the lack of opportunity for the court and the other parties to consider their inclusion and also because of the comparative success this last-minute group of schools has had in complying with the racial ethnic guidelines relative to those on the original list of 27. Indeed, the court commends the original proposal[3] for its

---

**3.** It is not only the law of this case, *Morgan v. Hennigan,* D.Mass.1974, 379 F.Supp. 410, 482, but of numerous Supreme Court decisions, e.g., *Green v. School Board of New Kent County,*

focus upon schools which are in need of special desegregation measures.

■ The proposal regarding 27 schools as clarified in the school defendants' January 25 filing, is adopted by the court subject to the following conditions: (a) unless some of the schools are closed, the list of schools and the number of reserved seats in them shall remain the same for a period of at least two years from implementation, and (b) during that period the State Board shall monitor and evaluate the operation and effect of the program, including (i) the actual and perceived fairness of assignment procedures whereby some students are assigned voluntarily and some mandatorily to the same school, (ii) the impact of the program on the school defendants' efforts to desegregate other community district and citywide schools, and (iii) the value of the program compared to the time and resources it may divert from other tasks of the Department of Implementation.

### Test of New Assignment Plan in Districts 3 and 4

■ The motion filed on December 20, 1984 by the school defendants concerning districts 3 and 4 was significantly modified during the hearing held on February 11, 1985. Originally the motion requested that students in those districts be assigned under the terms of the new proposal beginning in the fall of 1985. The proposal has been modified, largely during the hearing on February 11, so its implementation is now conditioned upon the degree of desegregation which would be achieved under it, as measured by parental responses on application forms to be sent out by March 25, 1985. The current assignment process is to proceed as usual in the event that the proposed plan does not live up to the school defendants' expectations. As originally presented, the plan placed heavy emphasis on guaranteeing students a seat in their home assignment area. Apparently be-

cause of the resegregative impact of such an emphasis, attention has shifted to the open-enrollment aspect of the proposed plan which, it is hoped, will lead to voluntary desegregation.

Essentially, the school defendants' plan must convert districts 3 and 4 into a consolidated, districtwide "magnet" system if it is to succeed, yet no magnet features currently exist at these schools and no means are provided to develop them. The success of the plan apparently relies entirely on the "marketing" of each school by its faculty and staff with "cooperation" from school officials. In most instances, in order to desegregate a school such marketing must convince parents to send their students to a school by bus rather than to a school within walking distance. How marketing of schools that do not offer distinctive merits can create incentives that will lead to voluntary busing is not clear.

Schools within districts 3 and 4 are certainly less distinctive than those in district 9, the citywide magnet district.[4] Although district 9 is largely successful in achieving its objective of voluntary desegregation, it is not generally over-subscribed, indicating that, even with careful planning of magnet programs and the years of cooperation of paired universities, colleges, and businesses, magnet schools are limited in their appeal.

The evidence offered at the hearing on this matter does not support a more positive conclusion. The survey commissioned by the Citywide Education Coalition shows only that, all else being equal, some parents would prefer a "distant" school which offered an educational program superior to that offered at a nearby school. This hypothetical preference is irrelevant in a situation in which programatic offerings and pedalogical approaches at the schools are relatively similar and other factors such as the racial/ethnic make-up and general con-

---

supra, that the school defendants must take affirmative action to desegregate, i.e., steps beyond mere compliance with court orders. Several of the subdivisions of the defendants' motion filed December 20, 1984 reflect such affirmative action, and support the court's belief that the instant proceedings are approaching a successful termination.

4. The lack of "distinctiveness" of these schools is not a criticism of the education they offer. The emphasis at community district schools has always rightly been on providing high-quality, standardized education, not on the development of a specialized curriculum or pedalogical approach.

dition of a school's neighborhood, the quality of a school's facilities, traffic congestion, and the actual distance of the school from the student's home, to name but a few, are inherently unequal. Furthermore, the survey does not address the issue of a parent's choice in a completely "magnetic" district, that is, between a nearby school with one magnet program and a distant school with a different magnet program. Finally, the testimony concerning the results of an analysis of 1983 applications leads only to the narrow conclusion that some parents wish that they could get their students into a "better" school. Whether those "better" schools were community district schools located in districts 3 and 4 or whether the student's attendance at such schools would enhance desegregation was not addressed.

At the hearings, counsel for plaintiffs and plaintiff-intervenors expressed serious misgivings about the workability of the school defendants' proposal and the additional costs it might entail, but reserved objections until after new style, as well as current style, applications for student assignments in district 3 and 4 have been returned and analyzed. Accordingly they assented to allowance of the school defendants' motion as modified. In the same spirit, i.e., of preferring voluntary to mandatory desegregation,[5] and in reliance on school defendants' representation that the plan will be implemented only if "consistent with the existing degree of desegregation", the court approves the school defendants' proceeding to obtain two sets of assignment applications for students in districts 3 and 4, in conformity with the timetable set forth in Attorney Dinger's letter dated February 15, 1985, attached hereto as Appendix A.

### Summary of Orders

1. The school defendants' motion to reconsider the court's decision the Umana School is denied.

2. Decision is deferred on the proposed addition of a sixth grade to the Latin

schools pending further submissions by the school defendants.

3. The proposed addition of grades 6–8 to Boston Technical High School is denied.

4. Recruitment of students to fill reserved seats is conditionally approved.

5. The school defendants' motion to test a new assignment process in districts 3 and 4, in conformity with Attorney Dinger's letter dated February 15, 1985, is allowed.

### APPENDIX A
February 15, 1985

The Honorable W. Arthur Garrity, Jr.
United States District Court for District of Massachusetts
U.S. Post Office & Court House
Boston, MA 02109

Re: Morgan, et al. v. Nucci, et al.
*Civil Action No. 72–911–G*

Dear Judge Garrity:

I understand that the Court has indicated a desire that the procedural mechanism for the implementation of the consolidated district proposal be elaborated in greater detail than was contained in the School Defendants' filing of February 14. This letter will supply this information.

As Mr. Coakley indicated in his testimony, the Department of Implementation ("DI") anticipates preparing applications for districts three and four which will permit assignments either under the procedures outlined in the December 20, 1984 filing or under the existing procedures. We have agreed to give plaintiffs' counsel an opportunity for input on an informal basis in the development of the application form. The DI expects to send these applications out no later than March 25, and to get them back by the week of April 8, in time to permit analysis over the spring school vacation.

The DI will make an initial determination whether the preferences expressed by parents in the consolidated district will permit a set of assignments consistent with those preferences which does not substantially

---

5. This has been the approach of the court and all parties since the inception of these proceedings, as indicated by the extensive use of then-

novel magnet schools and programs in the court's desegregation plan.

diminish the degree of desegregation which currently exists in districts 3 and 4. If this is not possible, the staff will so advise the School Committee and the School Defendants will so advise the Court and the parties. Assignments would then be made in the usual fashion.

If a set of assignments pursuant to the experimental procedures is possible consistent with the existing degree of desegregation, the staff has been directed to share their analysis with the School Committee so that the Committee can satisfy itself that the proposed assignments do not in fact resegregate Districts 3 and 4. Unless the Committee otherwise directs, the School Defendants will file the results of their analysis on or about May 3, 1985. We would expect the filing of responses and the scheduling of a hearing, if necessary, within ten days after this submission.

This schedule is modestly more optimistic than that initially suggested by Mr. Coakley in court. Mr. Coakley believes that timely assignments would still be possible if this schedule contained in this letter slipped by a few days.

Respectfully,
/s/Henry C. Dinger
Henry C. Dinger

HCD:cel

cc: Counsel of Record